THE UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION

| | |
|---|---|
| MICHAEL A. MACVAUGH<br>150 Nancys Lane<br>King of Prussia, PA 19408<br><br><br>Plaintiff<br><br>v.<br>COUNTY OF MONTGOMERY<br>One Montgomery Plaza<br>Swede Street, 8th Floor<br>Norristown, PA 19401 | CIVIL ACTION<br>No.:<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br>C.A. No: |

## COMPLAINT

Plaintiff, Michael A. MacVaugh, by and through his attorney Mark D. Schwartz, Esquire hereby files the following Complaint in accordance with the numbered paragraphs and avers the following:

### JURISDICTION AND VENUE

1. This Court in accordance with 28 USC 1331, has Jurisdiction over Plaintiff's claim, which asserts a violation of Title VII because this cause of action arises under a law of the United States.

2. This Court may properly maintain personal jurisdiction over the Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over the Defendants to comply with the traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

1

3. Pursuant to 28 USC 1391 (b)(1) and (b)(2) venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

4. Plaintiff properly exhausted his administrative remedies by timely filing a charge of Discrimination and Retaliation in the PHRC and the EEOC and by filing the instant lawsuit within ninety (90) days of receipt of the right to sue letter issued by the EEOC on August 29, 2017.

## PARTIES

5. Plaintiff, MacVaugh ("Plaintiff" or "MacVaugh") is an adult individual resident and citizen of the Commonwealth of Pennsylvania residing at 150 Nancys Lane, King of Prussia, PA.

6. Defendant, County of Montgomery, ("Defendant") is a municipal governmental entity maintaining offices at One Montgomery Plaza, 8th Floor, 425 Swede Street, Norristown, Pennsylvania, 19401.

## BACKGROUND INFORMATION

7. Plaintiff incorporates paragraphs 1-6 above as if set forth at length herein.

8. At all relevant times pertinent to this complaint, Plaintiff suffered from Crohn's disease, and other medical conditions that stem from his Crohn's disease, including Keratopathy, an eye disorder that develops in some people with Crohn's disease.

9. Mr. MacVaugh is a qualified individual with a disability within the meaning of the Americans with Disabilities Act, (hereinafter "ADA" and the state equivalent Pennsylvania Human Relations Act (hereinafter "PHRA").

10. The Courts have recognized Crohn's disease as a disability under the Americans with Disabilities Act.

11. The County of Montgomery is a municipal governmental entity governed by a three-member Board of Commissioners responsible for managing, supervising, and the operation of the Department of Public Safety, including but not limited to the Emergency Services Department.

12. Defendant has continuously had and does now have at least fifteen (15) employees.

13. At all relevant times, Defendant was an employer within the meaning of Section 101(5) of the ADA, 42 U.S.C.A. § 12111(5), and Section 107(7) of the ADA, 42 U.S.C.A. § 12117(a), which incorporates by reference Sections 701(g) and (h) of Title VII, 42 U.S.C.A. § 2000e(g) and (h).

14. Defendant was an employer within the meaning of the ADA and the PHRA.

15. Plaintiff was initially employed with the County from 1998-2000.

16. Plaintiff returned to Montgomery County in 2007 as a 911 Dispatcher in the Emergency Services Department.

17. Plaintiff performed his duties in Defendant's facility located in Eagleville, PA.

18. Plaintiff was considered a regular full-time employee at the time of his discharge on October 24, 2016.

19. At the time of his discharge the Plaintiff was working 2/3 days in twelve (12) hours shifts.

20. The Defendant has a very detailed employment handbook regarding the Plaintiffs rights under the ADA. Specifically, the handbook (version 2015/16) states as follows:

> It is the County's policy not to discriminate against any qualified employee or applicant with regard to any terms or conditions of employment because of such individual's disability or perceived disability so long as the employee can perform

the essential functions of the job. Consistent with this policy of nondiscrimination, the County will provide reasonable accommodations to a qualified individual with a disability, as defined by the ADA, who has made the County aware of his or her disability, provided that such accommodation does not constitute an undue hardship on the County.

21. The handbook also provides the process when and employee with a disability requests a "reasonable accommodation."

> Qualified individuals with disabilities may make requests for reasonable accommodation to the Human Resource Department. On receipt of an accommodation request, the Human Resource Director or his/her designee will meet with the requesting individual to discuss and identify the precise limitations resulting from the disability and the potential accommodation the County might make to help overcome those limitations.
>
> The Human Resource Director or his/her designee, will determine the feasibility of the requested accommodation, considering various factors, including, but not limited to, the nature and cost of the accommodation, the availability of tax credits and deductions, outside funding, the County's overall financial resources and organization, and the accommodation's impact on the operation of the department, including its impact on the ability of other employees to perform their duties and on the County's ability to conduct business.

22. Despite the mandates in the employer's handbook, the County proceeded on a course of ongoing and constant discrimination and retaliation against Plaintiff and fostered a discriminatory and illegal working environment.

23. In March 2008, Plaintiff was diagnosed with Crohn's disease. He was 31 years old.

24. Crohn's disease is an autoimmune disorder which causes extreme abdominal pain, diarrhea and fevers, and is associated with internal infections and abscesses that form in the pelvic cavity. Crohn's is exacerbated by stress and can occur through relapsing episodes that can be unpredictable.

25. Crohn's disease is a chronic medical condition that requires life-long medical management, medication, and hospitalizations.

26. On or about November 24, 2013, Plaintiff issued an email to his supervisors and HR representatives explaining in detail that he suffered from Crohn's disease and that he had a recent "flare-up" that required hospitalization.

27. Defendant was well aware of his condition as prior to the above-referenced email, when he called out sick he had also notified the on-call Supervisor that he was calling out sick because of a Crohn's disease flare-up.

28. Defendant absolutely knew as of November 2013 that the Defendant suffered from Crohns' disease.

29. In December 2013, Plaintiff had requested Family Medical Leave.

30. The County uses a "rolling" FMLA procedure, but in addition to FMLA, they also provide an opportunity to apply for a "General Leave of Absence" if an employee does not qualify for FMLA.

31. In February 2014, despite repeated requests, he still had not heard whether H.R. determined his FMLA had been accepted or denied, and or for how long he was eligible.

32. During this time Plaintiff was retaliated against as a result of requesting an accommodation due to his medical condition. He was cited for excessive absenteeism. He could not obtain clarification as to how many sick days he had accumulated.

33. The County Solicitors office represented that the excessive absenteeism warnings would be removed from his file. However, as of Plaintiff's termination in 2016, those warnings were still in his employment file and were, in fact, never removed.

34. Plaintiff's request for an accommodation to a different position that was more administrative in nature was denied.

35. Plaintiff also sought a position change for two jobs that were posted as "open" and "unfilled." These jobs had appealed to Plaintiff because they were administrative jobs, which had eight (8) hour shifts as opposed to his twelve (12) hour shifts.

36. The ADA has recognized job restructuring, part-time or modified work schedules, and reassignment to a vacant position as constituting a reasonable accommodation.

37. In 2013, Plaintiff retained an attorney to represent him in obtaining response to his request for FMLA time.

38. Since 2013, Plaintiff has had more difficulty with his Supervisors and the County H.R. Department.

39. As a result of his Chron's disease, Plaintiff requested and received intermittent FMLA leave on March 5, 2011, December 9, 2011, December 9, 2012 and September 24, 2015.

40. Plaintiff then returned to work in 2015.

41. In 2015, Plaintiff had a major abdominal surgery that required him to be out of work for a month.

42. When he returned to work, he was permitted to work eight (8) hour days for five (5) days, for only four weeks.

43. After the four weeks, he was required to go back to his 12-hour work day schedule.

44. After he returned to work in 2015, the Defendant began treating Plaintiff differently.

45. Upon information and belief, the Employer through its employees began to exclude Plaintiff from many activities in which he had engaged in the past. Specifically, he was excluded from training, meetings, and assisting with new hires.

46. Plaintiff felt he was being excluded because he was "sick."

6

47. In December 2015, Plaintiff was notified by his physicians that he needed double hip surgery, which was scheduled for February 2016.

48. Plaintiff notified his Platoon Commander, Tori Rosa, that he needed to undergo surgery.

49. When Plaintiff returned to work after his surgery, his supervisor chastised him in front of the shift staff for raising a concern during the meeting, which meeting was designed to raise and address concerns.

50. Plaintiff was also told by the Director of Public Safety, Tom Sullivan, that he needed to watch his etiquette on the dispatch radio.

51. Plaintiff had been in the same position since 2007 and he had rarely had been disciplined or corrected in that nine (9) years prior.

52. Plaintiff tried not to be concerned about these issues, but he was beginning to feel as if he was being targeted.

53. In July 2016, Plaintiff was called into the supervisors' room for a meeting with two of his supervisors.

54. In that meeting he was warned that "he was out of his seat too much and too long" and that "he was being watched, so make sure you are conscious of how much and how often you are out of your seat and how long your breaks are."

55. In August 2016, Plaintiff was again called into the office and was told that they believed he was "sleeping" on the job. Plaintiff informed them that he had closed his eyes because he was on medication that causes a complication with making his eyes dry. He further explained that it is a side effect of his disability.

56. That same day, about three hours later, Plaintiff's supervisors sent him home for allegedly sleeping.

57. When Plaintiff returned home, he contacted his physician, who provided a note to Defendant, as employer, regarding the medical conditions causing the dry eye symptoms.

58. Plaintiff was advised by Defendant's Deputy Director Cass, that his FMLA had expired and that he would need to re-apply.

59. On October 16, 2016, Plaintiff submitted the paperwork (FMLA application) to the Director of Public Safety for review the same day.

60. As in the past, Plaintiff's GI physician filled out the proper paperwork to be submitted as well.

61. At all relevant times, Plaintiff's supervisors as well as the Director were well aware that Mr. MacVaugh was re-applying for FMLA.

62. During this time, Plaintiff made numerous attempts to contact Human Resources, as well as his Department to inquire as to the amount of FMLA time he had available, as given the Defendant's "rolling" FMLA policy, it is difficult for him to establish how much time Plaintiff was entitled to.

63. If Plaintiff would have not qualified for FMLA, he could have also been entitled to a "General Leave of Absence."

64. Instead, on Monday October 24th, 2016, Plaintiff was sent home accused of sleeping.

65. Plaintiff had arrived for work at 6:30 a.m. that day, cleaned his work area and logged into the system.

66. At 7:12 a.m., Plaintiff needed to use the restroom, so he logged out of the computer and went to the restroom.

67. He returned to his console around 7:20 a.m., logged in; answered the radio and proceeded to do his job.

8

68. Around 7:30 a.m. Plaintiff started to experience dry-eye syndrome, getting relief by shutting his eyes.

69. Plaintiff's eyes were shut when his Supervisor, Kevin Rairdon, was walking by and asked him if he was okay.

70. Plaintiff opened his eyes, said he was fine, and proceeded with his daily routine.

71. Plaintiff then received an Instant Message through the work computer system, asking him to stop back and see both Supervisor Kevin Rairdon and Tim Detwiler.

72. Plaintiff logged off the computer system and proceeded to see both supervisors.

73. At that point, during the conversation, Mr. Rairdon made the following statements: "Well, you know why you are here?" "You were sleeping and we know your history of your medication and for that we are sending you home. We can't have this anymore."

74. Plaintiff explained that he wasn't sleeping and that his eyes were dry."

75. Mr. MacVaugh was then told: "this is not debatable, and we can't have this happen anymore!"

76. Plaintiff was sent home that day without being paid.

77. Later that morning, Plaintiff received a phone call from his Platoon Commander, Tori Rosa and was told that he was not to return to work until they contact him.

78. Later that afternoon, Plaintiff received a phone call from Platoon Commander Matt Markland advising him that he had to call Tom Sullivan.

79. Plaintiff then immediately contacted the Director of Public Safety, Tom Sullivan, who stated, "I have spoken to people in here (Department of Public Safety) and I have spoken to people downtown in HR. I have decided to let you go. You will receive a letter from the department as well as a letter from HR directing you what to do from here."

80. The acts alleged above, including Defendant's willful failure to accommodate Plaintiff's reasonable requests for accommodation, his reasonable request to take Family Medical Leave, Defendant's willful failure to remedy the hostile environment, and Defendant's retaliating against the Plaintiff for making the request and for advocating for himself in the past, all constitute unlawful employment practices in violation of ADA Section 102(a), 102(b)(I) and 102(b)(5)(A) and (B), 42 U.S.C.A. § 12112(a), (b)(I) and (b)(5)(A) and (B), and 43 P.S,§§ 951-963.

81. Defendant's employment practices, as alleged above, deprived Plaintiff of his equal employment opportunities and otherwise adversely affected his status as an employee, and were all the result of Plaintiff's disability.

82. Defendant engaged in the above-described conduct against with Plaintiff knowingly, with malice and in reckless disregard of Plaintiff's federal and state protected rights.

83. The Plaintiff alleges that the alleged discriminatory practices were continuing in nature, which persisted up to the point of termination.

84. On August 28, 2017 the EEOC issued a right to sue letter for Plaintiff's EEOC Charge Number 530-2017-01510 with regard to the discrimination which was received shortly thereafter.

### COUNT I

**VIOLATION OF TITLE I OF THE AMERICANS WITH DISABILITIES ACT and PENNSYLVANIA HUMAN RELATIONS ACT FOR DISCRIMINATION BASED UPON DISABILITY AND PERCEIVED DISABILITY, MAINTENANCE OF A HOSTILE WORK ENVIRONMENT and RETALIATION**

85. Plaintiff incorporates paragraphs 1 through 84 as if fully set forth at length herein.

10

86. Plaintiff is a qualified person with a disability within the meaning of Title I of the Americans with Disabilities Act and the Pennsylvania Human Relations Act.

87. After Plaintiff returned from his medical leave, the Defendants discriminated against him by engaging in discriminatory practices because he had a record of a substantial impairment.

88. The Defendant failed to provide any reasonable accommodations to the Plaintiff

89. Upon further information and belief, the defendant engaged in a course of conduct, which created a hostile work environment for the Plaintiff.

90. Defendant discriminated against the Plaintiff for asserting his rights to seek Family Medical Leave and failed to make reasonable accommodations when he returned to work.

WHEREFORE, Plaintiff respectfully seeks (1) economic damages in the form of lost back pay, front pay, medical expenses and medical insurance premiums and other pecuniary losses, together with interest as permitted by law; (2) compensatory damages for mental pain and anguish; (3) attorneys' fees and costs of this action; (4) punitive damages; (5) other affirmative relief necessary to eradicate the effect of Defendant's unlawful employment practices; and (6) such other and further relief as this Court deems necessary and proper.

## COUNT II

### DISCRIMINATION AND RETALIATION UNDER THE FAMILY MEDICAL LEAVE ACT

91. Plaintiff incorporates paragraphs one (1) through ninety-one (91) as if fully set forth at length herein.

92. Section 105 of the FMLA and section 825.220 of the FMLA regulations prohibit the following actions:

An employer is prohibited from interfering with, restraining, or denying the exercise of, or the attempt to exercise, any FMLA right. An employer is prohibited from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise any FMLA right. An employer is prohibited from discharging or in any other way discriminating against any person, whether or not an employee, for opposing or complaining about any unlawful practice under the FMLA.

93. Defendant, by and through its HR. Department, discriminated and retaliated against Mr. MacVaugh in failing to respond to his inquiries regarding available Family Medical Leave and delaying the Family Medical Leave process.

WHEREFORE, Plaintiff respectfully seeks (1) economic damages in the form of lost back pay, front pay, medical expenses and medical insurance premiums and other pecuniary losses, together with interest as permitted by law; (2) compensatory damages for mental pain and anguish; (3) attorneys' fees and costs of this action; (4) punitive damages; (5) other affirmative relief necessary to eradicate the effect of Defendant's unlawful employment practices; and (6) such other and further relief as this Court deems necessary and proper.

### JURY DEMAND

The Plaintiff demands trial by jury of all issues triable of right to a jury.

Dated: October 10, 2017

Respectfully Submitted,

Mark D. Schwartz, Esquire
P.O. Box 330
Bryn Mawr, PA 19010-0330
Telephone & Fax: 610 525-5534
Email: MarkSchwartz6814@gmail.com
Pa. I.D. #30527

Attorney for Plaintiff, Michael MacVaugh

## VERIFICATION

I, Michael MacVaugh, hereby depose and say that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge and belief. I understand that false statements herein are made subject to 18 Pa. C.S. 4904 relating to unsworn falsification to authorities.

Date: 2017 - October - 10th                     -Michael MacVaugh